LOTTINGER, Judge.
This matter is before us on an appeal taken by the defendant from a judgment of the City Court of the City of Lafayette in favor of the plaintiff as prayed for. The trial judge in a very painstaking manner analyzes the facts of the case and the law applicable thereto in his reasons for judgment which read as follows:
*252 “This is a suit between two real estate brokers for a division of a commission. Plaintiff seeks judgment in the amount of $250.00, representing his share of the commission collected by-defendant in a real estate transaction.
“Both parties are well established and highly reputable real estate brokers. A surprisingly lengthly record of testimony, approximately 265 pages, and a strongly contested legal action have highlighted this suit, although the monetary value involved is not very much. A delay in resolving this case was experienced by the Court because of the voluminous record and strongly contested position taken by each of the litigants. Each iota of fact had to be weighed and considered in light of the conflicting testimony, seeking at all times to correlate the facts and establish the evi-dentiary basis for a decision under the law.
“To outline each and every string of testimony would only serve to afford a long and cumbersome document, adding little or nothing to the facts sifted from the records on this case, Therefore, the court will review, but briefly, the relative positions of each defendant in retrospect to the conclusions of fact reached by the Court.
“One Joe Rodgers, represented by his wife, Mrs. Rodgers, sought in August of 1953 to place their residence, located in Lafayette, for sale. Mrs. Rodgers contacted defendant, Diamond S. Young, a real estate broker, to arrange with him for the marketing of their residence. She advised Mr. Young that she was friendly with the plaintiff’s agency, through association with plaintiff’s sales representative, Gordon Hamner and his wife, and would like to see both agencies handle the transaction. Defendant, Mr. Young agreed to handle the sale on either one of two propositions, namely: (1) Place the property on the open market between the two agencies and the agency selling the property would receive the entire commission; and, (2) or a joint listing would be signed and the commission to be divided equally between the two brokers, regardless of which one sold the property.
“There followed subsequent discussions between Mrs. Rodgers and each of the agents, but at no time did they meet together to discuss the actual terms. The agents did discuss the propositions, by phone, and agreed that they would prefer the ‘joint listing arrangement.’ In fact, immediately following the agreement, the plaintiff agency placed a ‘For Sale’ sign on the property. The listing was to be secured by plaintiff’s representative, Mr. Ham-ner; Mrs. Rodgers secured from Mr. Hamner the listing, took it home with her for her husband to approve and sign, but he never did sign it or any other listing. In the meantime, Mr. Young, defendant, secured a buyer-named Edwin Stockmeyer and the first sale agreement was signed on or about August 29, 1953, approximately 15 days-after the alleged agreement between the seller and the real estate agents. The owner, Mr. Rodgers, executed his-■signature to the sales agreement and subsequently in November signed a second sales agreement with the ultimate purchaser, Mr. Stockmeyer. The-negotiations between the buyer and. seller were handled exclusively by defendant, Mr. Young; the plaintiff had not come into contact with the parties-in this phase of the transaction.
“From August, 1953, to the date of the sale, January 28, 1954, no mention was made of the joint listing; nor was any signed. However, on Augus? 28, 1953, when the buyer, Mr. Stockmeyer, was in the defendant’s office to discuss the sale, the defendant did tell him that the commission would be divided *253 between his office and plaintiff, Mike Donlon.
“Since it is of great importance in the determination of the outcome of this case, consideration should be given to the facts surrounding the signed joint listing proposition. The seller did not sign the listing presented to him by plaintiff’s representative, Mr. Hamner. The testimony of all the parties clearly indicate that it was incumbent upon Mr. Hamner of plaintiff’s office to secure the signed listing. In fact, the decision of whether the property would be sold on the open market or by joint signed listing rested with plaintiff’s office, according to the testimony of Mrs. Rodgers who handled the negotiations for her husband with the agents. She stated that Mr. Hamner had contacted her, following approval of Mr. Donlon, in favor of the joint listing which was to be secured by Mr. Hamner. She picked up the listing form at plaintiff’s office, then followed a slight delay during which time defendant secured a buyer for the property and had the parties execute a sales agreement.
“There is some confusion in the testimony of the various witnesses as to the understanding of Mr. and Mrs. Rodgers regarding the need for a ‘signed joint listing’ in order to share the commission. It is apparent that they wanted the transaction to be handled by a sharing of the commission. When Mrs. Rodgers left Mr. Young’s office, she was to transmit to the plaintiff the conditions for the ultimate agreement. She discussed the propositions with Mr. Hamner of plaintiff’s office who said that approval of either of the propositions would be required of Mr. Donlon, owner of the agency. Later he called Mrs. Rodgers to confirm the fact that Mr. Donlon had approved the joint listing and sharing of commission proposition. This understanding was also discussed by plaintiff’s representative and Mr. Young. In other words, the parties had agreed to forego the first proposition, that is, sale on the open market, and chose to fulfill the second proposition, that is, signed joint listing and sharing of the commission.
“In order to establish a contract, it is axiomatic that there must be a meeting of the minds, else there would be no agreement. There must also be substantial performance of the obligations incurred in a contract in order to claim the benefits thereof. If the condition to be performed is not vital to the fulfillment of the contract, the failure to do so would not vitiate the agreement. The defendant contends that since there was no signed listing, he was not bound to share the commission, The plaintiff contends that the actual signing of a joint listing was of no consequence since the sale was consummated by one of the agents and the commission paid to him. Mr. Rodgers’ testimony tends to support the position of the plaintiff, however, its effect is weakened because of his failure to have discussed personally the intended agreement with the agents. All dealings were made by Mrs. Rodgers and relayed the understanding to Mr. Rodgers.
“Evidence on trial indicates that the listing was not signed for the simple reason that Mr. Rodgers was out of town between the date of the understanding and tire date of the signing of the first sale agreement with the ultimate buyer, representing the lapse of IS days. A second sale agreement with the same purchaser was later signed in November, 1953, and the sale was finally passed January 4, 1954, at defendant’s office. Both sales agreements and the final sale were executed by the owner, Mr. Rodgers, and no mention was made to Mr. Young of the *254 proposed division of commission. On January 28, 1954, Mr. Hamner called at Mr. Young’s office to secure his firm’s share of the commission and after some discussion a check for $150.-00, representing $100.00 less than one-half of the commission, was delivered to him. There is conflicting testimony in the record regarding whether or not the question of a signed joint listing was in existence. When Mr. Donlon advised Mr. Hamner to contact Mr. Young for the full one-half commission, Mr. Young refused to pay the difference. In the meantime, Mr. Young called Mr. Rodgers by phone and was informed that no signed joint listing had been executed. On the afternoon of January 29, 1954, Mr. Young instructed his bank to stop payment on the check previously given to Mr. Hamner. Mr. Young contended that he was under no obligation to pay any amount to Mr. Donlon’s firm since the latter had failed to secure a signed joint listing.
“It is apparent that plaintiff, through its representative, Mr. Hamner, would have had to secure the signed listing prior to August 29, 1953, the date of the execution of the first sales agreement, in order to share in the sales commission, if defendant’s interpretation of the verbal agreement is maintained. On the other hand, there was no need for a signed listing once the sale agreement had been executed by the buyer and seller, because a listing then would be of no consequence.
“It is of importance to consider the position of defendant following the arrangements made with Mrs. Rodgers. Mrs. Rodgers testified' that she wanted to find a buyer for the house and that pending an agreement' between Mr. Young and the plaintiff, the defendant could assume that the property was for sale on the open market. But this assumption was predicated upon the failure of the agents to reach an understanding as to how the property would be handled. Once this understanding was reached, it was of no further consequence who sold the property. In fact, the two agents did reach an understanding in which it was agreed that the property would be offered pursuant to a signed joint listing and a sharing of the commission, regardless of which agent effected the sale.
“By agreeing to the proposition that the property would be sold under a joint listing but failing to secure such a listing, did the plaintiff forfeit his right to one-half of the sales commission?
“Even though there is no written evidence of the agreement relating to the division of commission, the verbal understanding between the parties is binding. See Aviles v. Kelt[i]her, Inc. 5 La.App. 118 (1926).
“The purpose of a signed joint listing was to protect the agents from subsequent action of the principal in by-passing the brokers and selling the property through other medium. A signed joint listing was then of more value in determining the obligations of the principal in regard to the agents and not as between the agents themselves.
“In arguendo, let it be assumed that prior to securing a signed joint listing, the plaintiff would have found a buyer for the property, would not the present defendant be entitled to claim his share of the sales commission? Could the present plaintiff if placed in the position of defendant have then denied the other broker’s right to share in the commission because of a failure to secure a signed joint listing, a task placed upon the present plaintiff?
“It is well established in Louisiana jurisprudence that an agreement to pay commission for finding a purchaser for real estate entered into by an owner *255 and an agent need not be reduced to writing. See Whatley v. McMillan, 152 La. 978, 94 So. 905; (La.Sup.Ct., 1922); Isaac v. Dronet, 31 So.2d 299 (La.App. 1st Cir., 1947). It is, therefore, conclusive that when the owner (acting through his wife) had approved the sharing of the commission by a joint signed listing, that whether or not a joint signed listing was ever signed would be of no effect upon the owner’s obligation to the agents. The testimony of the witnesses indicate that there was an agreement reached wherein both agents would handle the sales effort. The facts are conclusive that the owner did consider himself bound by the verbal representations and agreement of his wife with the agents. He in fact did sell the property through one of the agents and likewise paid the usual commission. He could have with equal facility signed a listing prior to signing the sale agreements and ultimate sale; but having once signed the first sale agreement he bound himself to pay the commission. With or without a signed joint listing, the eventual result would have been the same; the signing of the sale agreements, the sale and the payment of the commission protected the agents equally as well as if a signed joint listing would have been executed by the owner. Although a signed joint listing would have been more prudent and certainly more expressive of the obligations of the owner to the two agents, the failure to sign was not fatally defective to the relationship of the two agents as to each other. If the defendant was so insistent upon securing a signed joint listing, what was there to prevent him from demanding that the owner sign one before executing the sale agreement? What the other agent could have done, so could he have done, equally well.
“It is regrettable that the parties had not clearly and unequivocally established their relationship in writing, but this oral action is not uncommon in the real estate brokerage business. Sometimes, as in this case, one of two employed agents, carries the brunt of the work and does not receive a commensurate share of the gain, but in the field of real estate brokerage that is considered one of the customary burdens of the job.
“Accordingly, judgment is rendered in favor of plaintiff as prayed for, reserving for future signature a judgment to be presented for signature in accordance with the foregoing reasons.”
We are impressed by the fact that, as pointed out by the trial judge, the defendant, when called upon by Mr. Hamner, did deliver his check for a part of the commission. He unquestionably at that time considered himself bound by the agreement and his only excuse for not paying the check was that he subsequently discovered that plaintiff had failed to secure the signed listing, a factor which, to our minds, considered in the light of the other facts of the case, is of little or no moment.
The defendant made much of the fact that while the petition alleges that the original agreement was entered into on or about the 10th day of September, 1953, that it was actually consummated in the early part of August of that year. We are not disposed to give much importance to this discrepancy. The principal witnesses, including the defendant himself, all agreed that there was but one agreement entered into with respect to the subject property and the variance in the date alleged and that established by the evidence was not such as to mislead or prejudice the defendant in any way
We find no manifest error in the judgment appealed from and same is therefore affirmed.
Judgment affirmed.